UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JOSEPH BONAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-cv-1185 |
| | ) |
| MARK RAY, BERWICK BLACK | ) |
| CATTLE COMPANY, LEON BORCK, | ) |
| WARD FEED YARD, INC., ILS | ) |
| FINANCING, INC., and WFY HOLDING | ) |
| CO., | ) |
| | ) |
| Defendants. | ) |

## <u>O P I N I O N and O R D E R</u>

Before the Court are the Motion to Dismiss and Motion to Strike Jury Demand filed by Defendants Ward Feed Yard, Inc., ILS Financing, Inc., WFY Holding Co., and Leon Borck, on August 3, 2009 (Doc. 10) and the Motion for Leave to File a Reply filed by the same Defendants on September 29, 2009 (Doc. 15). The Motion to Dismiss is GRANTED IN PART and DENIED IN PART, the Motion to Strike is GRANTED, and the Motion for Leave is DENIED.

### BACKGROUND

In early 2004, Joseph Bonar entered into a partnership agreement with Berwick Black Cattle Company, which is owned by Mark Ray (collectively "Ray entities"), for the purchase of cattle. According to the Complaint [Doc. 1], Bonar put up $10 million from February 2004 to September 2005 with the understanding that the Ray entities would use the funds to purchase and resell cattle. In exchange, the Ray entities guaranteed that Bonar would see a return of the principal amount in

addition to profits on the sale of cattle and/or interest payments. The venture initially generated a return to Bonar; however, by the end of 2005, Bonar did not see the return of $7.7 million in principal and $1 million in interest. Bonar alleges that the Ray entities used the money to buy and resell cattle and either used the proceeds themselves or pay other creditors. Thus, Bonar alleges that the Ray entities breached their contract with him.

Plaintiff also alleges that the Ray entities committed fraud. Plaintiff states that the Ray entities represented, through Ron Throgmartin, their agent, that the funds he would furnish would be pooled with other funds and used for the purchase of cattle, that the cattle would then be resold in weeks or a few months, and that he would see a return on these short-term cattle sales. Based on these representations, Plaintiff agreed to invest significant funds. Plaintiff then asserts that the Ray entities, presumably through Throgmartin, made additional representations of how his investment was being spent. Plaintiff, relying on these statements, invested additional money in the Ray entities' scheme. However, Plaintiff asserts that the Ray entities knew that these representations were untrue, that he relied on these untrue statements, and that he suffered damages as a result.

On December 26, 2006, Berwick and Ray were subject to separate involuntary Chapter 11 bankruptcy proceedings. Orders for Relief were entered in those proceedings on February 1, 2007, and the cases were ultimately dismissed on January 15, 2009. The Ray entities have failed to appear in the case at bar and an entry of default was made by the Clerk on September 30, 2009.

The remaining Defendants, Leon Borck, Ward Feed Yard, Inc. (hereinafter Ward), ILS Financing, Inc. (hereinafter ILS), and WFY Holding Co. (hereinafter WFY) (collectively "Ward entities"), are interrelated. The Complaint alleges that Ward and ILS are wholly owned subsidiaries of WFY. The Complaint further alleges that Borck is the president, chief executive officer, and chairman of the board of WFY, Ward, and ILS. Ward owns 6 cattle farms in Kansas and Nebraska.

The Complaint alleges that prior to the bankruptcy proceedings, the Ray entities were customers of Ward and they entered into various financial agreements. The Complaint details these financial arrangements and ultimately alleges that all of the Ward entities exercised control over the Ray entities' funds, assets (i.e. cattle) and payments made to the Ray entities' creditors such that the Ward entities determined which creditors to pay, including themselves. As such, the Complaint alleges that the Ward entities acted as an alter ego of the Ray entities and that the Ray entities were mere instrumentalities of the Ward entities (Count III). Plaintiff alleges that the Ward entities are liable for the indebtedness of the Ray entities. Plaintiff further alleges that the Ward entities violated Illinois' Fraudulent Transfer Act, 740 Ill. Comp. Stat. § 160/1 *et seq.*, by ensuring, through their control of the Ray entities, that their debt had priority (Count IV).

## DISCUSSION

### Motion for Leave to File Reply

Local Rule 7.1(B)(3) provides that no reply to a response is permitted. Other than indicting that a reply is "warranted," Defendants have not explained why the local rule should be disregarded.

**Motion to Dismiss**

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must view a complaint in a light most favorable to the plaintiff. *Williams v. Ramos*, 71 F.3d 1246, 1250 (7th Cir. 1995). The Court must accept all well-pleaded factual allegations and draw all reasonable inferences from those facts in favor of the plaintiff. *Richards v. Kiernan*, 461 F.3d 880, 882 (7th Cir. 2006). A plaintiff is not required to plead extensive facts, legal theories, or to anticipate defenses. *Massey v. Merrill Lynch and Co.,* Inc., 464 F.3d 642, 650 (7th Cir. 2006). However, a plaintiff must "provide the grounds of his entitlement to relief" that are "more than labels and conclusion [] [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007) (citations and editing marks omitted). In particular, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Rule 12(f) provides that any redundant, immaterial, impertinent, or scandalous matter may be stricken from a pleading. The Ward entities seek dismissal of Counts III and IV and striking of the jury demand.

As indicated above, Count III alleges that the Ward entities are alter egos of the Ray entities and that they are liable for the claims made in Count I, asserting fraud, and Count II, a breach of contract claim. In Count III, Plaintiff seeks to benefit from the equitable doctrine that "[i]f one corporation is merely a dummy or sham for another corporation, the distinct corporate entities will be disregarded and the two corporations will be treated as one." *Gass v. Anna Hosp. Corp.*, 911 N.E.2d 1084, 1091 (Ill. App. Ct. 2009). In order to pierce the corporate veil, Plaintiff must

ultimately show that "(1) there is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Id.*; *In re Rehabilitation of Centaur Ins. Co.*, 606 N.E.2d 291, 300 (Ill App. Ct. 1992) (for the alter ego doctrine to apply "two requirements must be met. First, there must be such a unity of interest and ownership that the separate personalities of the corporation and the dominating individual or entity no longer exist. Second, the facts must be such that an adherence to the fiction of separate corporate existence would endorse a fraud or promote injustice."); *See also Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569-570 (7th Cir. 1985). The first prong is determined based on a variety of factors including:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Il. App. Ct. 2005).[1]

---

[1] In *Van Dorn*, the Seventh Circuit provided a similar list:

> In determining whether the requisite degree of control is maintained by one corporation over the affairs of another to justify disregarding their separate corporate identities, the Illinois courts have considered some of the following: (1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own. *Id.* at 570.

5

The second prong requires a showing that there is "an element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest." *Gass*, 911 N.E.2d at 1091.

Defendants argue that Plaintiff has not pled a unity of interest and ownership or facts that would tend to show that maintaining distinct corporate entities would promote fraud or an injustice – or at least that Plaintiff has made only "conclusory allegations." In asserting that the Ward entities are alter egos of the Ray entities, Plaintiff allege that:

> 1. "Ward financed, advanced and paid for all aspects of Berwick's business operations. . . ." (Complaint ¶ 46)
>
> 2. "Ward, through its President, Mr. Borck, made all decisions regarding Berwick's business operations, including but not limited to deciding which creditors . . . would be paid, the amounts to be paid, the timing of payments, and the priority of those payments." (Complaint ¶ 47)
>
> 3. "These decisions included, without limitation, the buying, selling, liquidation, care, feeding, breeding, and further financing of cattle, as well as which claims against Berwick and/or Mr. Ray would be settled, including the manner and amount of any settlement."

Thus, Plaintiff essentially alleges that Ward[2] ran the business operations of the Ray entities. Defendants appear to argue that in order to state a claim for alter ego liability, Plaintiff must allege and provide details that would fulfill the list of factors to be considered by the Court under the unity of interest prong. This is not the function of notice pleading nor is Plaintiff's failure to track the factors fatal to his claim at this point. In deciding whether there is unity of interest, no one factor is

---

[2] The Court places a distinction, which is explained *infra*, between Ward and the other Defendants that make up the Ward entities.

6

determinative and the Court must "examine many factors." *Fontana*, 840 N.E.2d at 779. While Plaintiff must provide more than a recitation of the elements of a cause of action, Plaintiff's assertion that Ward controlled the *entirety* of the Ray entities operations, is sufficient at this stage of the proceedings. Plaintiff has alleged, at least, that there was a failure to observe corporate formalities, that there was a diversion of assets, that it treated the Ray entities funds as its own, and that there was a failure to maintain arms-length relationships; and, there is a reasonable inference that the Ray entities were merely a façade for Ward.

Defendants next argue that Plaintiff has not adequately alleged that recognizing the separate corporate existence of the Ray entities and Ward would sanction fraud or would promote injustice. Defendants argue that Illinois courts do not pierce the corporate veil simply to allow a Plaintiff to collect on a debt. *See Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1991) ("[C]ourts that properly have pierced corporate veils to avoid 'promoting injustice' have found that, unless it did so, some 'wrong' beyond the creditor's inability to collect would result."). In response, Plaintiff argues that the Complaint alleges that Ward earned profits from running the Ray entities and selling or using their assets but also shielded themselves from the Ray entities' creditors. In the cited paragraphs, Plaintiff alleges that the Ward entities "exercised control . . . for the purpose . . . to ensure . . . the Ward Parties' ability to continue earning substantial profits through their relationships with the Ray parties, at the expense of numerous other creditors of and investors in the Ray Parties' cattle operations." (Complaint ¶ 91). Essentially, Plaintiff alleges that the Ward entities controlled the Ray entities'

7

assets in order to increase their profit and prioritize the debt owed to them to the detriment of other creditors. This argument does not seem to assert a claim that recognizing the separate corporations would sanction a fraud, rather, Plaintiff appears to assert that to do so would promote injustice.

In *Van Dorn*, the Seventh Circuit stated that once a party has established unity of interest or control, a plaintiff must show "*either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice" in order to pierce the corporate veil and hold one corporation accountable for the acts of another. *Id*. 753 F.2d at 570 (emphasis in original). In that case, the "promotion of injustice" was found where evidence established that the puppet corporation was "stripped of its assets and rendered insolvent to the prejudice of [plaintiff], its only creditor" while the dominant corporation "received the benefits of [plaintiffs'] can shipments." *Id.* at 573. In *Sea-Land*, the Seventh Circuit surveyed current Illinois law on what constitutes the type of injustice to justify piercing the corporate veil. As examples, *Sea-Land* stated:

> Generalizing from these cases, we see that the courts that properly have pierced corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful. *Id.* 941 F.2d 524.

At this stage of the proceedings, Plaintiff's allegation are sufficient in that they assert that Ward or the Ward entities used the Ray entities to maintain its cattle

8

operations, maximize its profits, and essentially siphoned assets from the Ray entities in order to satisfy the debt owed to it to the detriment of other creditors with, potentially, higher priority.

Plaintiff states that he invested in the Ray entities from February 2004 to September 2005. (Complaint ¶ 24). He alleges that for five years prior to the Ray entities' bankruptcy proceedings (which started in December, 2006), Ward and the Ray entities were doing business. (Complaint ¶ 36). From June 1, 2005 to December 2006, Plaintiff alleges that Ward exercised control and domination over the Ray entities. Thus, during some of the time period that Ward allegedly controlled the Ray entities, Plaintiff was investing money with the Ray entities. During that time period Ward allegedly used the Ray entities' assets (and presumably Plaintiff's investment) to maintain its cattle operations, increase its profits and to repay indebtedness. The end result appears to be that the Ray entities were unable to pay other creditors, like Plaintiff, and ultimately became the subject of involuntary bankruptcy petitions. These facts appear to be similar to the facts that the Seventh Circuit found would promote injustice in *Van Dorn*. While it is yet to be seen whether Plaintiff can actually prove any of his allegations to support the alter ego doctrine, they are sufficient to withstand this motion to dismiss.

Notwithstanding this Court's conclusion that Plaintiff has stated an alter ego claim vis-à-vis Ward and the Ray entities, the Complaint is flawed in that it groups the Ward entities without any allegation that they are one and the same. That is, Plaintiff groups Ward, ILS, WFY, and Borck and treats them as one entity rather

9

than separate corporations, which is what they appear to be. Plaintiff then attributes the actions of Ward as being actions of the other entities without any allegation that the corporate veil should be pierced as to each of them. At most, Plaintiff has alleged the corporations are interrelated and that Borck runs each of them; there is no allegation that they are identical or that they should legally be treated as the same entity.[3].

The Complaint specifies that "Ward financed, advanced and paid for all aspects of Berwick's business operations" (Complaint ¶ 46), and that "Ward, through its President, Mr. Borck, made all decisions regarding Berwick's, business operations" (Complaint ¶ 47). Plaintiff alleges that Ward entered into a financial arrangement with the Ray entities (Complaint ¶¶ 50-57) and that neither ILS, WFY, or Borck "individually lend or advance monies to either of the Ray Parties." (Complaint ¶ 58). The Complaint then, inexplicably states "[a]s a result of the control that the Ward *Parties* exercised over the Ray parties . . ." (Complaint ¶ 49 (emphasis added)) and "the Ward Parties decided which creditors of the Ray parties would receive payment . . . ." (Complaint ¶ 68)  While the Complaint appears to allege that ILS and WFY *benefitted* from Ward's control of the Ray entities (through the alleged "preference" payments outlined in paragraphs 65 through 71 of the Complaint), the Complaint is confusing as to whether they were actually the alter egos of the Ray entities. There is also no allegation that either ILS, WFY, or Borck

---

[3] Plaintiff also groups Mark Ray and Berwick Black Cattle Company, two apparently separate entities, without making any allegation as to why they should be considered one-and-the-same. At most, Plaintiff alleges that Ray owned Berwick. This is not sufficient to pierce the corporate veil with respect to these entities.

are alter egos of Ward (merely indicating that Borck made decisions for all three corporations is insufficient). Therefore, pursuant to Rule 12(e), Plaintiff is directed to provide a more definite statement of which particular corporation is alleged to be the alter ego of the Ray entities. Plaintiff should also provide a more definite statement as to whether Mark Ray is an alleged alter ego of Berwick. In doing so, Plaintiff should be mindful that unless there are allegations to the contrary (and allegations that comply with Rule 8, Rule 11, and the standard outlined above), each of Defendants are necessarily separate legal entities and are not interchangeable.

Besides grouping all Defendants, Plaintiff also is asserting an alter ego claim with respect to both Counts I and II. That is, Plaintiff is alleging that the Ward entities, as alter ego of the Ray entities, are liable for both the alleged breach of contract and the alleged fraud. As noted by Illinois Courts, an alter ego claim "is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." *Peetoom v. Swanson*, 778 N.E.2d 291, 295 (Ill App. Ct. 2002). As to the breach of contract claim, the Court finds that Plaintiff has sufficiently plead to withstand the motion to dismiss. Plaintiff essentially argues that the Ray entities failed to pay him as agreed and that during the time of the breach, the Ward entities controlled the Ray entities. Thus, at the time of the breach, the Ward entities (or only Ward as the case may be) used the Ray entities to "conduct" their own business and that they may be liable for damages under the alter ego theory.

11

This same conclusion cannot be drawn with respect to the fraud count. In Count I, Plaintiff appears to make out a common law fraud claim.[4] Plaintiff alleges that the Ray entities told Plaintiff that they were using his initial investment to buy cattle, when they knew that this representation was false, for the purpose of inducing Plaintiff to invest more money in their scheme. *See Fox v. Heimann*, 872 N.E.2d 126, 138 (Ill. App. Ct. 2007). The Complaint, however, is vague as to whether these statements were made during the alleged "control period" with the presumptive knowledge of the Ward entities – after June 1, 2005. If the Ward entities did not control the Ray entities when the misrepresentations were made, it follows that they cannot be liable, under an alter ego theory, for the alleged fraud. Therefore, the Ward entities cannot be liable for the damages Plaintiff seeks under the fraud count as alleged. Plaintiff is granted leave, however, to file a more

---

[4] No party has sought dismissal of this Count. The Court uses the term "appears" because this claim is unclear. In the introductory paragraphs of the Complaint, Plaintiff states that the Ray entities and Ron Throgmarin made misrepresentations, *prior to the investment of money*, as to how the money would be used. Plaintiff then states that according to these misrepresentations and early returns on his money, he invested more money. (Complaint ¶¶ 16, 18, 23). The Ray entities, however, allegedly used the money for other purposes. (Complaint ¶ 26). This sounds like a breach of contract claim. In Count I, however, Plaintiff seems to state that misrepresentations of materal fact were made about how the money *he had already invested with* the Ray entities was being spent (Complaint ¶ 73), and that these statements induced him to give the Ray entities *more money*. This sounds like a defense to breach of contract, a fraud in the inducement claim; however, Plaintiff is not seeking the equitable remedy of rescission, but is seeking money damages. See *Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007) (noting that this is an equitable claim). The next option is common law fraud. However, there is no statement that Plaintiff, under all the circumstances, "had a right to rely on the false representations." *Soules v. General Motors Corp.*, 402 N.E.2d 599, 599 (Ill. 1980).

definite statement of this claim to make allegations that would cure these defects (if consistent with Rules 9[5] and 11).

In Count IV, Plaintiff raises a claim pursuant to Illinois' Uniform Fraudulent Transfer Act (UFTA). 740 ILL. COMP. STAT. § 160/1, *et seq*. The Act protects against fraudulent transfers premised on actual fraud or constructive fraud. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078-1079. The Complaint does not specify which section of the Act Plaintiff is relying on. However, based on the turn of phrases used, Plaintiff is referring to § 160/6 of the Act. This section provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[6] *Id.* 740 ILCS at § 160/6(a) and (b).

Defendants argue that Plaintiff has failed to allege fraud with particularity as required by Rule 9(b), that the claims are internally inconsistent, and that the claims are time-barred.

---

[5] Pursuant to Rule 9(1)(b), fraud must be pled with particularity. Plaintiff only identifies Throgmartin as the person making the fraudulent statements and does not specify when these statements were made or where they were made. It is further unclear, because Plaintiff groups Mark Ray and Berwick, whether Throgmartin was an agent of either or both. If Plaintiff refiles this claim, he must do so consistent with the particularity requirements of Rule 9.

[6] Commonly referred to as the "insider preference claim." *In re Eckert* 288 B.R. 813, 844 (Bankr. N.D.Ill. 2008).

In order to analyze this claim, it is necessary, as Plaintiff recognizes in his response, to separate Defendants. With respect to WFY, ILS and Borck the Complaint specifically alleges that "[a]t no time did ILS, WFY, or Mr. Borck individually lend or advance monies to either of the Ray Parties" and none of these parties entered into any financial agreements with the Ray entities (Complaint ¶ 58). As such, Plaintiff's claims against these Defendants necessarily must proceed under § 160/6(a). Plaintiff does allege that Ward entered into financial agreements with the Ray entities and that the Ray entities were indebted to Ward. Plaintiff further alleges that Ward was an "insider." Therefore, Plaintiff's claims against Ward proceed under § 160/6(b). While Plaintiff makes this distinction in its response to the Motion to Dismiss, the Complaint itself does not. As such, Plaintiff shall provide a more definite statement, pursuant to Rule 12(e), as to which claims he is making as to each Defendant. In particular, Plaintiff shall provide more detail as to the circumstances of his § 160/6(a) claims against ILS, WFY, and Borck.

With respect to the § 160/6(b) claim, Plaintiff has pled with particularity. Plaintiff asserts that he invested $10 million with the Ray entities from February 2004 to September 2005. While Plaintiff does not specify a date, he alleges that the Ray entities breached their contract, thus resulting in a claim as a creditor. The Ray entities then transferred funds to Ward (or the Ward entities) from April 2006 to December 2006, presumably pursuant to the June 2005 $9 million promissory note (the "antecedent debt"). Plaintiff alleges that Ward was an "insider" – namely

14

a person who controlled the Ray entities. *See* 740 Ill. Comp. Stat. § 160/2(g)(2)(C)).[7] Plaintiff then alleges that the Ray entities were insolvent during the time period and that Ward knew they were insolvent. Such allegations are sufficient under the Act for proceeding under a constructive fraud theory pursuant to § 160/6(b). Therefore, the claims are sufficient under Rule 9(b).[8]

The only remaining argument is the assertion that Plaintiff's UFTA claim is time-barred. The statute provides that "[a] cause of action . . . under this Act is extinguished unless action is brought" within 4 years "after the transfer was made" on a § 160/6(a) claim or within 1 year on a § 160/6(b) claim. 740 ILL. COMP. STAT. § 160/10(b) and (c). Defendant argues that because the transfers were made, at the very latest on December 1, 2006 and this lawsuit was not filed until May 26, 2009, Plaintiff's UFTA claims are time-barred (being filed more than two years later).

---

[7] Defendants argue that Plaintiff has not pled with particularity the manner of "control" exercised by Ward. The level of particularity sought by Defendants is unreasonable at this stage of the proceedings. Plaintiff essentially alleges that Ward controlled *all* aspects of the Ray entities' business. At the pleading stage, without the benefit of discovery, Plaintiff is not required to provide the depth of detail that Defendants appear to be demanding.

[8] In *General Elec. Capital Corp*, cited by both parties, the Seventh Circuit considered the requirement of Rule 9(b) within the context of a constructive fraud claim pursuant to the UFTA. The Court found that the plaintiff made sufficient allegations when it complied with "Form 13" appended to the Federal Rules. That form no longer is a part of the Appendix to the Federal Rules of Civil Procedure, however, the substance of the ruling still applies. Because Plaintiff is not alleging an actual fraud claim, mechanical adherence to the "who, what, why, when, where" analysis advocated by Defendants makes little sense. Rather, it is sufficient for Plaintiff to assert the date and conditions of the agreement between Plaintiff and the Ray entities, the amount that is still owed, a description of the events surrounding the transfer of assets from the Ray entities to Ward, and, as relevant here, an assertion of Ward's knowledge as to the Ray entities' insolvency. *See id.* 128 F.3d at 1079-1080.

Plaintiff argues, however, that the intervening bankruptcy tolls this statute of limitation, making the time period of December 26, 2006 to January 15, 2009 inapplicable (meaning that only 5 months elapsed between the transfers and the lawsuit). The parties' arguments center on whether the limitations period is a "statute of limitations" as oppose to a "statue of repose." As stated by the Illinois Supreme Court:

> a statute of repose differs from a statute of limitations in that a statute of limitations governs the time within which lawsuits may be commenced after a cause of action has accrued, while a statute of repose extinguishes the action itself after a fixed period of time, regardless of when the action accrued. *DeLuna v. Burciaga*, 857 N.E.2d 229, 237 (Ill. 2006).

Generally, a statute of limitations defense is an affirmative defense, *see* FED.R.CIV.P. 8(c), that will not be considered on a motion to dismiss unless the "plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Foundation, Inc. v. Cerberus Capital*, 559 F.3d 671, 674-675 (7th Cir. 2009). The limitation period of the statute is straightforward: Plaintiff must bring his § 160/6(b) claims within 1 year of the allegedly fraudulent transfer. Plaintiff contends, however, that 735 ILL. COMP. STAT. § 5/13-216 tolls the limitations period. That statute provides:

> Stay of action. When the commencement of an action is stayed by injunction, order of a court, or statutory prohibition, the time of the continuance of the injunction or prohibition is not part of the time limited for the commencement of the action. *Id*.

Plaintiff then argues that the intervening bankruptcy is "the injunction or prohibition" that would stay the limitations period. To support this proposition, Plaintiff relies on *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988),

and an unreported bankruptcy case, *In re Fry*, 1997 WL 666152 (Bankr. N.D.Ill. 1997) as examples. *Xonics Photochemical* concerned a federal statute, 11 U.S.C. § 548, which is the equivalent of some portions of the UFTA, but not § 160/6(b). The Seventh Circuit stated that the "right to invoke" § 548 "belongs not to a particular unsecured creditor . . . but to the trustee (or debtor in possession) as the representative of all the unsecured creditors." *Id.* at 202. In *In re Fry*, the bankruptcy court noted that the bankruptcy trustee has standing to assert a fraudulent conveyance claim and that a creditor does not have standing unless it seeks permission from the bankruptcy court to essentially stand in the shoes of the trustee. *Id.* at * 3. Neither case deals with a statute of limitations. Neither case stands for the proposition that an intervening bankruptcy proceeding stays the limitations period for filing a claim pursuant to the UFTA.

Plaintiff has pointed to no specific injunction or prohibition that would invoke § 5/13-216 and toll § 160/10(b) and (c) during the intervening bankruptcy. *Xonics Photochemical*, at most, provides dicta that a trustee could bring a claim pursuant to a federal statute on fraudulent transfers; but, it makes no mention of which limitations period would apply and whether such a period should be tolled for the benefit of a creditor. *In re Fry* actually cuts against Plaintiff's position because it states that a trustee has standing to make such a claim and that a creditor must petition the *bankruptcy court* to assert such a claim. Again, that case had nothing to do with a statute of limitations.

The remaining case cited by Plaintiff, *In re Werner*, 386 B.R. 684 (Bankr. N.D. Ill. 2008), considered § 160/10(a) of the UFTA. That subsection, unlike the

relevant subsections here, §160/10(b) and (c), states that a claim under subsection 160/5(a) must be brought within 4 years of the fraudulent transfer or "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." Relying on this language, the *In re Werner* court determined that "[t]he very text of the statute itself allows actions to be brought later than four years," rendering it a statute of limitations. *Id.* at 968. *In re Werner* can be limited to the text that it considered; and, because § 160/10(a) is substantially dissimilar to §§ 160/10(b) and (c), its conclusion is not persuasive as to the issue before this Court.

As indicated above, sections 160/10(b) and (c) are straightforward statues of repose: a § 160/6(b) claim is "extinguished" if it is not brought within 1 year of the fraudulent transfer. Plaintiff has alleged facts that establish that his claims are brought over two years after the last alleged fraudulent transfer. Plaintiff has offered no convincing authority as to why this period of repose should be tolled because of the intervening bankruptcy. Plaintiff has pled himself out of court on this claim.[9]

## Motion to Strike

As indicated above, Plaintiff's alter ego claim sounds in equity. Plaintiff is not entitled to a jury on this claim. *See International Fin. Serv. Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 737-738 (7th Cir. 2004). At this stage of the proceedings, the Court declines Plaintiff's invitation to convene an advisory jury on this claim. This claim will be considered by the Court after a determination of

---

[9] This conclusion would not apply to any potential § 160/6(a) claim that Plaintiff may have because such a claim is governed by a 4 year limitations period.

Counts I and II have been made on a motion for default judgment, a motion for summary judgment, or trial.

## Conclusion

For the foregoing reasons, the Motion to Dismiss (Doc. 10) is GRANTED IN PART and DENIED IN PART, the Motion to Strike Jury Demand (Doc. 10) is GRANTED, and the Motion for Leave to File a Reply (Doc. 15) is DENIED.

Count I will not be dismissed at this point of the proceedings. However, Plaintiff shall provide a more definite statement of this claim as indicated above. To the extent that Plaintiff seeks to hold the Ward entities liable in Count III for the alleged fraud committed by the Ray entities, the claim is DISMISSED WITHOUT PREJUDICE. Plaintiff is GRANTED leave to re-plead this claim consistent with this opinion and order.

Plaintiff is GRANTED leave to re-plead Count III to provide a more definite statement as indicated above.

Count IV is DISMISSED as to Defendant Ward Feed Yard, Inc. Plaintiff is GRANTED leave to re-plead Count IV as to Defendants ILS Financing, Inc., WFY Holding Co., and Leon Borck as indicated above. Plaintiff's jury demand as to Count III is STRICKEN. Any amended complaint shall be filed by April 2, 2010. Defendants shall responds to any such amended complaint within the time provided by Rule 15.

The Court notes that the Clerk has made an entry of default with respect to Mark Ray and Berwick Black Cattle Company. Neither of these parties have made an entry of appearance. Plaintiff shall expeditiously move forward on his claims

against these two entities by seeking default judgment. In the event that Plaintiff files a motion for default judgment, the remaining Defendants are given leave to respond.

This matter is REFERRED to Magistrate Judge Gorman for all further pretrial proceedings.


Entered this 16th day of March, 2010

                                              s/ Joe B. McDade
                                             JOE BILLY MCDADE
                            Senior United States District Judge